IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT LEE NORRIS, | ) | CASE NO. 1:04 CV 213 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| v. | ) | |
| | ) | |
| TAMARA ENGLE, *et al.*, | ) | |
| | ) | **MEMORANDUM OPINION &** |
| Defendants. | ) | **ORDER** |

## I.  Introduction

Robert Lee Norris (Norris), an Ohio prisoner with a claimed history of health problems,  filed a *pro se* complaint under 42 U.S.C. §§ 1983, 1985 against the warden of his previous place of incarceration and various prison officials[1] (the prison officials) alleging that they failed to provide him with non-smoking housing in violation of his Eighth Amendment right to be free from cruel and unusual punishment.[2]

After Norris initially moved for summary judgment,[3] the prison officials sought,[4] and the Court granted,[5] the dismissal of two named defendants for an inability to obtain service.

---

[1] ECF # 1.

[2] *Id.*

[3] ECF # 14.

[4] ECF ## 26, 27.

[5] ECF # 30.  Defendants Dr. Lenzy Southall and Lt. Hill were dismissed; defendants Gordon Lane (Lane), warden at North Central Correctional Institute (NCCI), and Tamara Engle (Engle), Unit Manager at NCCI, remain.

 The remaining officials then moved for summary judgment asserting that they had not been deliberately indifferent to Norris' serious medical needs.[6]  Norris, now represented by appointed counsel,[7] opposed the motion,[8] to which the prison officials replied.[9]  After consenting to the jurisdiction of the Magistrate Judge,[10] the parties participated in oral argument on the motions for summary judgment,[11] and Norris filed a supplemental brief.[12]

For the reasons that follow, the Court finds that the prison officials are entitled to summary judgment and that Norris' complaint should be dismissed.

## II.  Facts

### A.    Marion Correctional Institution (MCI) and initial non-smoking restriction

While incarcerated at MCI in 2002,[13] Norris was examined by Dr. Mendel Reid (Reid), then the MCI Medical Director, when he complained that "cigarette smoking [in his dormitory] was causing [him] increased coughing, and that was exacerbating his hernia...."[14]

---

[6] ECF # 51.

[7] ECF # 35.  The Court acknowledges, with thanks, the outstanding quality of the representation provided by appointed counsel, Timothy F. Sweeney, in this case.

[8] ECF # 56.

[9] ECF # 57.

[10] ECF # 62.

[11] ECF # 63.

[12] ECF # 64.

[13] ECF # 51, Ex. 8.

[14] ECF # 55, Ex. C (deposition of Mendel Reid, M.D.) at 52.

As a result of this examination, Norris was given a "Non smoking Dorm Restriction" by Dr. Reid on a temporary basis until February 22, 2003.[15]

According to Dr. Reid, there were three types of restrictions for non-smoking housing within the Ohio prison system.[16]  A priority one non-smoking restriction was an order for immediate non-smoking accommodation for an inmate with a documented serious medical need, such as asthma, Chronic Obstructive Pulmonary Disease, and other verifiable conditions known to be seriously affected by environmental tobacco smoke (ETS).[17]  A priority two non-smoking restriction was an intermediate level designation applicable to an inmate with some reason for non-smoking housing "when available," and who was, therefore, entitled to priority treatment over those in level three, but not above those classified as priority one.[18] Priority three non-smoking was merely an "acknowledgment that someone wanted nonsmoking housing but actually had no medical – strong medical reason for it to be recommended.  It was more or less a heads up that this person had asked for nonsmoking, and was the institution able to accommodate them based upon non-medical needs."[19]

---

[15] ECF # 56, Ex. D (deposition exhibits) at 11.

[16] *See*, ECF # 55, Ex. C at 52-58.

[17] *Id.* at 53; *see also*, ECF # 51, Attach. 11 (affidavit of Mendel Reid) at ¶ 7.

[18] ECF # 55, Ex. C at 53.

[19] *Id.* at 56-57.

Dr. Reid's non-smoking restriction for Norris was entered on a form that provides for priority one restrictions – those judged to be medically required and which must be accommodated immediately – to be noted on a separate line marked "Non-Smoking Priority (1) Only."[20]  Norris' restriction was not entered in that space but, rather, on a line for restrictions based on "other" grounds.[21]  Consequently, it is not clear in this instance whether Norris had a doctor's order – a priority one – entitling him to receive an immediate, mandatory re-assignment to non-smoking facilities or a lesser grade restriction.[22]

The form further provides that a copy of any medical restriction should be given to a number of individuals and placed in the inmate's medical records.[23]  Yet, there is no evidence that any non-smoking medical restriction applicable to Norris was actually placed in his records.  However, it is undisputed that at some point in November, 2002, Dr. Reid, as the Medical Director at MCI, authorized some kind of non-smoking restriction for Norris.[24]

As a consequence of receiving this non-smoking restriction, Norris was placed in a non-smoking bed at MCI in November, 2002.[25]

---

[20] ECF # 56, Ex. D at 11.

[21] *Id.*

[22] *See*, ECF # 55, Ex. C at 86-87 (Reid); *but see*, ECF # 52 at 23 (Norris).

[23] ECF # 56, Ex. D at 11.

[24] ECF # 55, Ex. C at 87-88.

[25] *See*, ECF # 52 (deposition of Robert Lee Norris) at 23-24.

**B.      Subsequent examinations and restrictions at MCI**

On January 2003, Dr. Reid again examined Norris, this time upon complaints of "cough and back pain."[26]  The doctor's orders from that exam include a "Nonsmoking Restriction Renewal."[27]  The nurse's notes for that date further contain the phrase "when available" on the line marked "NON-SMOKING PRIORITY (1) ONE ONLY."[28]  Dr. Reid explained that by writing "when available" the nurse was attempting to make clear that it was a priority two – not priority one – non-smoking restriction that was being ordered for Norris.[29]

On February 19, 2003, Dr. Reid yet again examined Norris because, as related in the notes, Norris "wants nonsmoking priority [because he is] coughing around cigarette/cigar smoking.  Abdominal pain with coughing."[30]  Dr. Reid testified that his medical assessment, as written in his progress notes, was that Norris was a "non-smoking priority 2."[31]  However, no doctor's orders or medical restrictions to that effect originating from this examination appear in the general prison record at MCI.

---

[26] ECF # 56, Ex. C at 37-38.

[27] ECF # 56, Ex. B at 10.

[28] ECF # 56, Ex. D at 12.

[29] ECF # 55, Ex. C at 117-18.

[30] ECF # 56, Ex. C at 38.

[31] ECF # 55, Ex. C at 93.

Accordingly, it is undisputed that Dr. Reid authorized a non-smoking restriction for Norris while at MCI in November of 2002.[32]  The reasons for such a non-smoking order, the length of such restriction, and the priority level actually ordered are, however, disputed.  In that regard, Dr. Reid stated:

> Mr. Norris did not fit the typical profile of someone who we would strongly recommend nonsmoking housing for.  He didn't have asthma or COPD.  I do not recall that he had any significant coronary artery disease, and so my recommendation for him – it needs additional explanation....Each institution has some latitude within reason to individualize their medical care within the limits of the policies that we provide.  We do leave some room for innovation.  In Mr. Norris' case, my recommendation was – If you see my order, it said nonsmoking housing when available or prior to (sic), which means that it was not prior to (sic) someone with asthma.  That would have been prior to (sic) one or you need to get medical housing at this time; and it was then done in consideration of his complaints, which were difficult to verify.  Nevertheless, with an assumption, as most physicians do that, your patients are actually accurate and truthful about their condition.  But it was not with the urgency and insistency with priority one housing.  It was let us try to accommodate this gentlemen, and let's try to get him nonsmoking housing.[33]

In sum, Dr. Reid is clear that although "Norris did not fit the typical profile of an inmate to whom I would order a non-smoking accommodation ... I gave Norris the benefit of the doubt and granted him a non-smoking accommodation.  However, I indicated that this non-smoking accommodation was not high priority and should only be accommodated if and when such housing was available.  I issued a Priority 2 order."[34]

---

[32] ECF # 55, Ex. C at 87-88; ECF # 52 at18-23.

[33]  ECF # 55, Ex. C at 52-53.

[34] ECF # 54, Attach. 1 at 8, 9.

Norris disputes Dr. Reid's account, asserting that Dr. Reid told him he had a priority one non-smoking restriction.[35] When confronted with the medical restriction form specifically noting that non-smoking accommodations were to be made available to him only "when available," Norris concedes that "[t]he document speaks for itself," but claims that he did not see the document or this notation at the time. [36]

Therefore, while the priority level of the nonsmoking order and the strength of the medical condition supporting the order issued at MCI are disputed, it is clear that Dr. Reid issued some kind of non-smoking restriction for Norris at MCI, that Norris understood that he had received such an order, and that Norris was placed into non-smoking housing.

## C.    Transfer to NCCI

In March, 2003, as a result of planned renovations to the non-smoking dorm at MCI where Norris resided, Norris, along with another inmate incarcerated at MCI in the non-smoking facilities that were to be closed for renovation, was transferred from MCI to the North Central Correctional Institution (NCCI).[37]  The transfer request from the warden at MCI to the state prison system authorities indicates that:

> Inmate Norris is currently living in a cell block that will soon be evacuated for a construction project.  Inmate Norris has a non-smoking restriction along with a restriction that disallows him to climb stairs.  When Mr. Norris leaves his cell block, the only non-smoking housing unit will be upstairs.  We are

---

[35] ECF # 52 (transcript of Norris deposition) at 23.

[36] *Id.*

[37] *See*, ECF # 51, Ex. B at 6.

requesting that Mr. Norris be transferred to NCCI as that facility has completely non-smoking downstairs.[38]

The request form further reflects that, despite the explicit internal reference to Norris' non-smoking restriction, the proposed transfer was classified as for "administrative" reasons, not "emergency" or "medical."[39]

Lane, the warden of NCCI at the time, testified he understood that the reason for the transfer was because of the closing of a cell block at MCI, but cannot remember if information concerning any smoking restriction was communicated to him prior to the transfer.[40]  Norris believes that Lane would necessarily have been notified of the underlying reason for the transfer and of his non-smoking restriction.[41]

**D.**     **Norris at NCCI**

*1.*     *Initial assignment and medical examination*

Upon arriving at NCCI in March, 2003, along with another inmate, Norris was booked into the facility, given a room assignment in a smoking dorm, and then sent for an initial examination by an NCCI nurse.[42]  The purpose of this health screening examination was to document any relevant medical conditions, medications, and current treatments.[43]  As a result

---

[38] *Id.*

[39] *Id.*

[40] ECF # 55, Ex. B at 22.

[41] ECF # 52, Attach. at 87.

[42] ECF # 56, Ex. C at 7-9.

[43] *Id.*

of examining Norris, the nurse did not list any non-smoking restrictions on his intake screening form.[44]  However, the nurse did note  that Norris was complaining of frequent nose bleeds and was requesting a "Non-Smoking Dorm (States Reason Transferred Here)."[45] Accordingly, the nurse arranged for Norris to see an NCCI physician, Dr. Lenzy Southall, the next day.

Norris testified that when he arrived at NCCI he was simply assigned to a smoking cell block by the count officer[46] and that the other inmate transferred from MCI at the same time – purportedly also to accommodate a smoking restriction[47] –  was immediately given a non-smoking dorm.[48]

## 2.    *Ohio's assignment system for non-smoking prison beds*

The Ohio Department of Rehabilitation and Correction ("ODRC") policy in effect at the time required that each institution designate smoke-free living and recreational areas for inmates.[49]  Specifically, ODRC policy 10-SAF-01 states that:

> Managing officers[50] shall create smoke free housing units or areas within their respective institutions.  Inmate requests for a non-smoking housing assignment shall be accommodated if possible ... Inmates with a documented medical

---

[44] *Id.*

[45] *Id.*

[46] ECF # 52, Attach. at 26.

[47] *Id*. at 25.

[48] ECF # 55, Ex. A at 18-20.

[49] ECF # 55, Ex. B at 41.

[50] The warden is the "managing officer" of a prison.  *See*, ECF # 56, Ex. F. at 12-13.

recommendation for a smoke free housing assignment shall be so accommodated.[51]

As Warden of NCCI, Lane understood this policy to mean that inmates needed a documented medical recommendation for smoke free housing from the doctor at NCCI in order to be guaranteed smoke-free accommodations.[52] However, Lane further understood that "[i]nmates who simply had a *preference* for smoke-free housing could also be placed in smoke-free housing provided that there was no inmate with a medical issue who *needed* placement in smoke-free housing."[53]

Lane also testified that, in his understanding, the written state policy on providing non-smoking accommodations to inmates did not require NCCI to act upon a medical recommendation for such facilities made at another institution.[54] Specifically, Lane testified that:

> Although Norris had a non-smoking accommodation at Marion Correctional institution, it was the custom and practice of the institution that, if an inmate were transferred to another institution, any accommodation, restriction or medical order (e.g. non-smoking, bunk, range, job, sports, medicine, testing) had to be renewed at the receiving institution by that institution's physician. As such, any accommodation or restriction that Norris had at Marion Correctional Institution was null and void upon transfer to NCCI. Dr. Southall had to examine the inmate and had the discretion and independent medical judgment to renew any orders that the doctor felt were medically necessary.[55]

---

[51] *Id.*

[52] ECF # 55, Ex. B at 42-45.

[53] ECF # 51, Ex. C (affidavit of Gordon Lane) at ¶ 6 (emphasis added).

[54] ECF # 55, Ex. B at 43.

[55] ECF # 51, Ex. C at ¶ 12.

-10-

Lane's belief as to the need for an independent medical determination of the need for non-smoking accommodations by the physician at each facility where an inmate is incarcerated is corroborated by the testimony of Dr. Reid, Engle, and NCCI Inspector of Institutional Services, Larry Yoder.

Dr. Reid, the medical director at MCI, testified that he had no expectation that his non-smoking restriction made at MCI would necessarily be renewed after Norris was transferred to NCCI, stating that "[i]t was my expectation that the physician at the receiving institution would review the inmate's medical file, re-examine the inmate, and make his independent medical diagnoses as to the proper course of treatment for the inmate."[56] Likewise, Engle, the unit manger at NCCI, stated that "even though Norris had the non-smoking accommodation at Marion Correctional Institution, it is still the practice of NCCI that any medical accommodation needs to be reviewed by the NCCI physician."[57] Yoder, who oversaw the inmate grievance procedure at NCCI, similarly testified that he believed that "upon Norris' transfer to NCCI, any and all accommodations or restrictions that he had at MCI were void."[58]

The broad ODRC policy was implemented by a more specific policy at NCCI as to how inmates were to receive non-smoking accommodations in that facility. That policy was North Central Correctional Institution Policy Number 3A-006, which provides:

---

[56] ECF # 54, Attach. 1 (affidavit of Mendel Reid) at ¶ 15.

[57] ECF # 51, Ex. A (affidavit of Tamara Engle) at ¶ 17.

[58] ECF # 51, Ex. B (affidavit of Larry Yoder) at ¶ 9.

2.      An inmate will kite[59] the Correctional counselor of Crawford A/B and request a non-smoking dorm application.  Once the application is received by the Correctional Counselor, he/she will place the inmate of (sic) a waiting list.  Inmates will be moved in to the dorm in the order that the applications are received....

3.      If an inmate is ordered by the Medical Staff to be placed in the non-smoking dorm, they will be moved into the dorm as soon as a bed is available.

4.      The Correctional Counselor will be responsible for initiating the bed moves with the permission of the Unit Manager through the count office via a move sheet.

5.      The Correctional Officer will ensure the inmate assignment rosters in the unit are updated.[60]

During this time at NCCI, the sergeants kept the waiting list for the non-smoking dorm and would move inmates accordingly.[61]  Engle stated that any "kites" she received requesting non-smoking housing not based upon a medical need would be given to the sergeant to be placed on the list.[62]

However, Norris disputes that this was how the system functioned at NCCI.  He testified that "[a]t North Central, you don't have to have a serious underlying medical

---

[59] A "kite" is a written message or request.

[60] ECF # 56, Ex. F at 11.

[61] ECF # 55, Ex. A at 68.

[62] *Id.*

condition to get nonsmoking; all you have to do is ask for it."[63]  Further, "The waiting list is subject to who you are, not so much where you're at on the list."[64]

### 3.    *Medical evaluation at NCCI*

On March 27, 2003, Dr. Southall examined Norris.[65]  He issued a number of doctor's orders confirming previous medical directives for Norris but did not issue the non-smoking dorm restriction.[66]

When asked about this examination, Norris stated that he discussed the basis of his transfer with Dr. Southall and objected to Dr. Southall's independent evaluation:[67]

> Because it was my position then, as it is now, that a transfer per DRC policy 5120-9-21, there are only two types of transfers, administrative and disciplinary.  And before I could have been transferred from Marion back to North Central, it had to have been signed off by Columbus, who are his supervisors.  And as such my placement in nonsmoking wasn't subject to his discretion or approval.[68]

However, Larry Yoder, the person charged with investigating inmate complaints at NCCI, testified that, contrary to Norris' beliefs, while "the Bureau of Classification and Reception [in Columbus] has the authority to move an inmate to any institution within the

---

[63] ECF # 52, Attach. 1 (Norris deposition) at 35.

[64] *Id.*

[65] ECF # 56, Ex. C at 7.

[66] ECF # 56, Ex. B at 9.

[67] ECF # 52, Attach. 1 at 29.

[68] *Id.*

ODRC prison system ..., [it] does not have the authority to assign an inmate to a particular dormitory or bed within that institution."[69]

Norris further stated that, contrary to the prison official's understanding of the state's policy, "I didn't see [non-smoking housing] as a privilege. I saw it as a right."[70] In addition, Norris asserted that Dr. Southall did not tell him that he lacked a serious medical need for smoke-free housing.[71]

### 4.    *Norris's complaints*

According to Norris, after not being placed in non-smoking housing on arrival at NCCI, he immediately began complaining to prison officials that he was not being placed into non-smoking housing, consistent with his medical status as found by the physician at MCI. Norris stated that he "prepared an informal complaint the next day,"[72] which he sent to Engle.[73] After Dr. Southall told Norris he was not going to grant a non-smoking restriction at NCCI, Norris alleges that he then "confronted everybody."[74]  However, no informal

---

[69] ECF # 51, Ex. B at ¶ 7.

[70] ECF # 52, Attach. 1 at 35.

[71] *Id.*

[72] *Id.* at 36.

[73] *Id.*

[74] *Id.* at 40.

complaint appears in the record on or about this date.[75]  Further, Norris later agreed that the first formal complaint on this issue is dated May 27, 2003.[76]

Norris testified that he "began a series" of informal complaints to Engle stating that he had a medical need for non smoking.[77]  Engle agrees that Norris approached her shortly after he arrived at NCCI: "I couldn't put a time frame on it, but I would say probably shortly after he arrived."[78]  Engle also admits that Norris told her that he was transferred in order to accommodate his non-smoking restriction.[79]

However, Engle disputes the alleged series of informal written complaints that Norris asserts were sent.  Engle testified that she did not keep records of verbal conversations[80] but would answer all written requests.[81]

In reference to Lane, Norris testified that within two or three days after initially seeing Dr. Southall he spoke with Lane.[82]  Lane agrees that Norris spoke with him but could not say how soon after Norris arrived that the conversation took place.[83]  It is undisputed, however,

---

[75] *Id.* at 38, 40.

[76] *Id.* at 88-89.

[77] *Id.* at 38.

[78] ECF # 55, Ex. A at 42.

[79] *Id.* at 46.

[80] *Id.* at 42.

[81] *Id*. at 118.

[82] ECF # 52, Attach. 1 at 40-41.

[83] ECF # 55, Ex. B at 25.

that there was some kind of communication between Lane and Norris where Norris informed Lane of the basis of his transfer and his belief that he had a medical need for non-smoking housing that the warden at NCCI should have upheld.[84]

Thus, although the exact timing is not known, it is clear that shortly after arriving at NCCI, Norris informed both Engle[85] and Lane[86] of his belief that he had a medical condition requiring assignment to non-smoking housing, which he believed was the underlying basis for his transfer.

It is also clear that Norris never attempted to have his name placed on the waiting list maintained by the sergeants for those who wanted non-smoking housing but did not have a medical restriction. Rather, it appears that Norris, from the start of his time at NCCI, took the position that he had a valid medical reason for non-smoking housing and elected to work solely within that framework to obtain it or be transferred out of NCCI.[87]

## 5. *Defendant's response to complaints*

Lane stated that in response to Norris' complaint, "I went and checked with the doctor."[88] According to Lane, Dr. Southall told him that "[h]e [Norris] doesn't have to be in a non-smoking dorm immediately. He's requesting it; but based on his condition, he

---

[84] *See*, ECF # 52, Attach. 1 at 40-43.

[85] ECF # 51, Ex. A (Engle affidavit) at ¶ 8.

[86] ECF #51, Ex. C (lane affidavit) at ¶ 11.

[87] ECF # 52, Attach. 1 at 57-58.

[88] ECF # 55, Ex. B at 25.

-16-

doesn't have to be there immediately. But if there's availability down the road or he can go through his unit, you know, that's fine. But I don't recommend that right now."[89] Lane testified that he then told Norris that he spoke with Dr. Southall and that it was the physician's opinion that he did not have a medical need to be placed in nonsmoking.[90] Lane then told Norris that because a non-smoking restriction would "not [be] coming from Dr. Southall right now," if he wanted non-smoking housing, "you need to go to your unit manager and request to be put in a nonsmoking dorm."[91]

Similarly, Engle testified that she responded to Norris' initial complaints about not receiving non-smoking accommodations by informing him that if he wanted non-smoking housing at NCCI, he would have to "kite medical," *i.e.*, notify the sergeants who kept the waiting list.[92] She told Norris that his two options were either for the institutional physician at NCCI "to reissue a medical non-smoking order ... or I could put him on a waiting list."[93] Notwithstanding this statement, Engle acknowledged that she understood from the master file that Norris had a previous medical restriction.[94] Based upon this information, Engle "immediately went and I talked – discussed this over with the inspector and my supervisor

---

[89] *Id*. at 26.

[90] *Id.* at 34.

[91] *Id.*

[92] ECF # 55, Ex. A at 45.

[93] *Id.*

[94] *Id* at 50.

and was told not to move him based on that, he needed a medical clearance or statement from the medical doctor here."[95]

Nonetheless, Norris was offered non-smoking housing at NCCI – without a medical recommendation of need and with no evidence that this was the result of him being on the waiting list.[96]

**6.      *Final resolution***

Despite this offer, to which Norris objected because it would have placed him in a non-smoking facility not to his liking,[97]  Norris remained housed in the smoking dorm at NCCI.  On May 27, 2003, approximately 2 months after arriving at NCCI, Norris submitted a written "Informal Complaint" to Engle stating that "[u]pon my arrival at NCCI, I was immediately placed in Hardin D #83 [a smoking bed]  while another inmate whom as well was transferred with my (sic) under the very same medical accommodation basis, was placed in Crawford A/B non-smoking unit."[98]  Norris requested to be accorded "medical ... placement" in Hardin A/B and a complete physical examination in order to assess the extent of his injuries.[99]

---

[95] *Id.* at 48

[96] *See*, ECF # 52 (Norris deposition) at 51.

[97] *Id.* at 57.

[98] ECF # 51, Ex. A, Attach. 5.

[99] *Id.*

-18-

Engle responded to this informal complaint on June 6, 2003, by writing:

> You need to submit your concerns to the medical department ... I cannot
> answer for me, and your transfer.  I have spoken to Mr. Yoder and have made
> him aware that you were transferred for non-smoking accommodations.  He
> advised me that it is the doctor's decision here at NCCI to grant you a medical
> non-smoking order.[100]

On May 28, 2003, Engle e-mailed Yoder to inform him that Norris gave her that

complaint regarding his non-smoking status.  Engle stated:

> I told him I was in conversation with you about possibly moving him to
> Crawford Unit ... He still is very hesitant and stakes (sic) he would refuse the
> lock ... He keeps insisting he was transferred here because of non-smoking
> medical accommodations but was put in a smoking environment.  I checked
> his master file and it does state he was transferred here because they were
> closing a non-smoking block and he cannot go upstairs.[101]

Yoder's response dated May 29, 2003, simply states "OK – but until the Dr. writes a

nonsmoking order, we don't have to worry why he was sent here."[102]

Norris agrees that Engle offered to move him to non-smoking housing in Crawford.[103]

However, Norris did not see that as an option because of alleged problems that he had with

an inmate in that unit and problems with the unit manager of Crawford.  Norris retorted that

"my solution was even simpler than that.  Transfer me.  Send me back."[104]

---

[100] *Id.*

[101] ECF #51, Ex. A, Attach. 4.

[102] *Id.*

[103] ECF # 52 at 57.

[104] *Id.* at 58.

-19-

In response to the disposition of his informal complaint, Norris filed a formal "Notification of Grievance" on June 5, 2003.[105]  In this grievance, Norris stated "the managing officer has already refused to answer any of my numerous 'kites' and personal requests for intervention in this matter ... I have 'repeatedly' sought relief from the Respondent whom is Unit Manager over the Hardin A non-smoking housing unit, that unit has, since my March 26, 2003 transfer maintained numerous open beds.[106]  There is no indication in the record other than Norris' allegations as to whether there were open beds maintained in the Hardin A non-smoking unit.  Nor is there evidence as to how many persons, if any, were on the waiting list for non-smoking housing.[107]

In any event, however, the issues of how many persons may have been on the waiting list for non-smoking housing and the number of available non-smoking beds, if any, for non-medical requests did not enter into Engle's decision to deny Norris a non-smoking bed because he was seeking a medical accommodation for non-smoking.[108]  Engle testified that if a re-assignment was to be based upon a medical need, she needed authorization from her superiors or a medical order.[109]  Otherwise, if Norris was seeking a non-smoking re-assignment only pursuant to the waiting list, Engle stated that "[t]he sergeant would move

---

[105] ECF # 51, Ex. C, Attach. 3.

[106] *Id.*

[107] *See*, ECF # 55, Ex. A (Engle deposition) at 55-56.

[108] *Id.* at 52-53.

[109] *Id.* at 59-60.

the inmate if there were open beds." [110]  Likewise, Lane provides no specific information as to the number of persons on the waiting list, but asserted that "[t]here was always someone waiting to get into the non-smoking dorms."[111]  Lane further testified that he did not have any knowledge as to how long the list was or what names were on the list.[112]  Thus, Lane provides an inference that the list was populated, but no firm testimony as to the details.  As noted, there is no evidence that Norris chose to put himself on the list as a way of obtaining non-smoking housing.

On June 6, 2003, Norris was finally transferred to Hardin A non-smoking accommodations.[113]  Lane stated that "[d]espite Dr. Southall's medical opinion, after I received Norris' grievance, I wanted to effectuate Norris' move to non-smoking housing. I consulted with Major David Morris about the issue.  After our discussion, I ordered Major Morris to move Norris."[114]  Norris appears to contend that the transfer was actually ordered by prison authorities in Columbus.[115]

---

[110] *Id.* at 67-68.

[111] ECF # 55, Ex. B (Lane deposition) at 13-15.

[112] *Id.* at 13-15.

[113] *See*, ECF # 51, Ex. C, Attach. 4.

[114] ECF # 51, Ex. C at ¶ 15.

[115] *See*, ECF # 56 at 21.

# III.   Analysis

## A.    Standard of review – summary judgment

The standard for evaluating motions for summary judgment is well-established and well-known.  Federal Rule of Civil Procedure 56(c) provides in pertinent part:

> The judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case.[116]  Once the moving party satisfies its burden, "the burden shifts to the non-moving party to set forth specific facts showing a triable issue."[117]

Determination that there is a dispute as to an issue of material fact requires the application of evidentiary standards.[118]  However, "[a] non-moving party need not 'produce evidence in a form that would be admissible at trial to avoid summary judgment.'  Instead, the relevant inquiry is whether the non-moving party has designated 'specific facts showing there is a genuine issue for trial.'"[119]  Nevertheless, the non-moving party may not simply

---

[116] *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

[117] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, (1986).

[118] *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

[119] *O-So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 505 (6th Cir. 1992) (internal citations omitted).

rely on the mere allegations of its pleading.[120]  Courts must evaluate the evidence presented "in the light most favorable to the party opposing the motion."[121]  However, the reviewing court must not evaluate the evidence to determine the truth of the matter, but to determine if there is a genuine issue of material fact for trial.[122]

A dispute regarding a material fact is "genuine," thus placing the matter beyond the reach of summary judgment, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[123]  If the non-moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which it has the burden of proof," then summary judgment is appropriate.[124]

In the end, as the Sixth Circuit has stated, summary judgment is designed to allow the movant to "challenge the opposing party to 'put up or shut up' on a critical issue."[125]

**B.    Standard of review – Section 1983 action based on Eighth Amendment claim of "cruel and unusual" punishment**

42 U.S.C. § 1983 permits a person to recover damages upon proof (1) that he was deprived of a right secured by the Constitution or laws of the United States; (2) that the

---

[120] *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

[121] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[122] *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

[123] *Anderson*, 477 U.S. at 248.

[124] *Celotex*, 477 U.S. at 323.

[125] *BDT Products v. Lexmark Int'l*, 124 F. App'x 329, 331 (6th Cir. 2005).

deprivation was caused by a person acting under the color of state law; and (3) the deprivation occurred without due process of law.[126]

As the Sixth Circuit stated in *Blackmore v. Kalamazoo County*,[127] "[t]he Eighth Amendment forbids prison official from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs."[128] Accordingly, "deliberate indifference to [an inmate's] need for medical attention suffices for a claim under 42 U.S.C. § 1983."[129]

It is well-settled that an inmate states a cause of action under the Eighth Amendment by alleging that prison officials have "exposed him to levels of ETS (environmental tobacco smoke) that pose an unreasonable risk of serious damage to his future health."[130]

*Blackmore* further holds that a § 1983 claim based on prison officials acting with "deliberate indifference" to an inmate's "serious medical needs" has both "objective and subjective components."[131]

The "objective" component requires proof of a "sufficiently serious" medical need.[132] As the Supreme Court stated in *Farmer*, the inmate must show that "he is incarcerated under

[126] *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 995 (6th Cir. 1994).

[127] *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004).

[128] *Id.* at 895, quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

[129] *Id.*, citing *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985).

[130] *Helling v. McKinney*, 509 U.S. 25, 35 (1993).

[131] *Blackmore*, 390 F.3d at 895, citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[132] *Id.*, quoting *Farmer*, 511 U.S. at 834.

-24-

conditions posing a substantial risk of serious harm."[133]  The Sixth Circuit in *Blackmore*

clarified this teaching by stating that where a plaintiff's injury or illness is "one that has been

diagnosed by a physician as mandating treatment or one that is so obvious that even a

layperson would easily recognize the necessity for a doctor's attention," the condition is

objectively "sufficiently serious."[134]

The "subjective" element requires an inmate to prove that prison officials had "a

sufficiently culpable frame of mind in denying medical care."[135]  Establishing this frame of

mind requires proof that the official being sued "subjectively perceived facts from which to

infer a *substantial* risk to the prisoner, that he did in fact draw the inference and that he then

disregarded that risk."[136]

Thus, "[d]eliberate indifference requires a degree of culpability greater than mere

negligence, but less than 'acts or omissions for the very purpose of causing harm or with the

knowledge that harm will result.'"[137]  In that regard, the Supreme Court has stated that "an

_____

[133] *Farmer*, 511 U.S. at 834.

[134] *Blackmore*, 390 F.3d at 897, citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990).

[135] *Id.*

[136] *Perez v. Oakland County*, 466 F.3d 416, 424 (6th Cir. 2006), quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (emphasis added).  *Accord*, *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999),  no Eighth Amendment liability unless official "knows of and disregards an *excessive* risk to inmate health or safety...."(internal citation omitted; emphasis in original).

[137] *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005), quoting *Farmer*, 511 U.S. at 835.

-25-

official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."[138]

Related to risks that an official might have perceived but actually did not is the situation where an official relies upon a medical diagnoses or prescribed course of treatment that is ultimately alleged to be injurious to the prisoner.  The Sixth Circuit has held that prison officials, not being medical professionals, are "entitled to rely on the diagnosis of the treating physician" in ordering or acquiescing to any medical treatment later charged to be an Eighth Amendment violation.[139]  Reliance on a medical opinion, or the absence of an opinion, as insulation from liability does not apply, however, where either significant time has elapsed from when the medical directive was originally issued[140] or where a defendant had a basis from which to subjectively infer the presence of a risk and did nothing to confirm or deny that inference by seeking a medical opinion.[141]

---

[138] *Farmer*, 511 U.S. at 838.

[139] *Dillon v. Wilson*, 935 F.2d 269 (6th Cir. 1991), citing *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987).  *See also*, *Humphries v. Smith*, 9 F. App'x 304, 308 (6th Cir. 2001) (Prison official's reliance on information derived from inmate's medical records made by treating physician "cannot constitute an Eighth Amendment violation."  *Accord*, *Karracker v. Peters*, 63 F.3d 170, 1995 WL 508074, at *4 (7th Cir. Aug. 18, 1995) ("Prison administrators, having no medical expertise, must rely on those with such medical expertise to assess the needs of prisoners and initiate treatment.")

[140] *Perez*, 466 F.3d at 425 (where suicidal inmate's condition was known not to have remained stable between the time of the medical diagnosis and the prison official's act in making a housing assignment based on that diagnosis, the prison official could not rely on the diagnosis as a shield from a finding of deliberate indifference).

[141] *Farmer*, 511 U.S. at 843 n.8.

-26-

**C.     The prison officials here are entitled to summary judgment in that they were entitled to rely on the medical opinion that Norris was not required to be in non-smoking housing.**

Without reaching the issue of whether Norris satisfied the "objective" element of the two-pronged test for maintaining a claim that prison officials acted with "deliberate indifference" to a "serious medical need," the evidence is uncontroverted that the officials here were entitled to rely on the medical opinion of Dr. Southall that Norris was not medically required to be in non-smoking housing.

Norris seeks to avoid the plain consequences of Dr. Southall's decision not to extend the prior non-smoking medical restriction by alternatively arguing: (1) that the officials had actual knowledge of Norris's prior non-smoking medical restriction, both from the transfer documents and from Norris's own representations, and so were aware of facts regarding Norris's medical needs apart from Dr. Southall's recommendations from which an inference could be drawn about his current requirements;[142] (2) that the conditions where Norris was assigned were "obviously" intolerable to a layperson, as evidenced by defendant Engle's own intolerance of these conditions;[143] (3) that state prison regulations mandated the assignment of an inmate seeking non-smoking housing, even without a medical directive, be done "if possible," and there is no evidence that non-smoking space was not available at the time of

---

[142] ECF # 56 at 14.

[143] *Id.* at 15.

Norris's transfer to NCCI;[144] and (4) the reliance on Dr. Southall's opinion by prison officials was purely pretextual.[145]

None of these arguments essentially vitiates the fundamental fact that Norris was not given a medial non-smoking restriction by Dr. Southall at the time Norris arrived at NCCI and so, as a matter of law, prison officials at NCCI were entitled to rely on that opinion in assigning Norris to housing. Norris's frequent citation to his prior non-smoking restriction at another prison only highlights the soundness of the rule that non-medical prison officials should not be required to weigh and evaluate conflicting medical opinions from different doctors before taking action that could later jeopardize them for making the "wrong" choice in areas where they have no professional basis for making a decision.

Unlike those cases where "deliberate indifference" is manifested by prison officials refusing to involve medical professionals in circumstances that may pose a risk to an inmate, here, Ohio had a policy that recognized that ETS could be a medical risk for some inmates, and Norris was seen by a physician both at MCI and within a day of his transfer to NCCI. And unlike those case of "deliberate indifference" where a layperson would be on notice that a course of action recommended by a medical professional might be unwarranted because it was contrary to obvious facts about the inmate's health and/or the intended action, here, Norris did not have lung cancer, heart disease, or other significant conditions obvious to a layman that could be worsened by exposure to ETS. Thus, even if Dr. Southall's

---

[144] *Id.* at 15-16.

[145] *Id.* at 17.

determination that Norris was not entitled to non-smoking housing as a medical necessity was malpractice, the prison authorities acted promptly to afford Norris a medical examination and were entitled to rely on the results.

Further, attempting to use an individual defendant's personal, idiosyncratic level of tolerance for a specific condition of incarceration as a touchstone for ascertaining a violation of constitutional standards is not supportable.  As the Sixth Circuit noted in *Talal v. White*,[146] the existence and enforcement of a policy to accommodate non-smoking inmates – specifically to make non-smoking housing available on a priority basis to those inmates with a medical order demonstrating need for such facilities and to provide prompt medical examinations when inmates complain of conditions they allege to be related to ETS – is not deliberate indifference to the unchallenged presence of ETS in the prison.[147]

In addition, Norris's contention that prison officials did not properly apply Ohio's policy regarding accommodation of non-smoking requests by inmates without a "documented medical recommendation" is, by itself, not relevant.  Unlike the situation in *Talal* where there was proof that prison officials regularly disregarded their own regulations on smoking in the face of evidence that they knew that the plaintiff needed non-smoking housing,[148] this Court does not sit to adjudicate disputes as to how Ohio prison officials apply Ohio administrative regulations where there was a specific medical finding that Norris did not require

---

[146] *Talal v. White*, 403 F.3d 423 (6th Cir. 2005).

[147] *See*, *id.* at 428.

[148] *Id.* at 427-28.

non-smoking housing.  The determinative inquiry here is, as stated, whether prison officials were "deliberately indifferent" to a "serious medical need" by Norris for smoke-free housing, not whether the prison officials acted correctly in dealing with a request for non-smoking housing not supported by the prison's doctor.

Thus, if Norris wishes to argue that his desire for non-smoking housing – without a medical determination of need – should have been accommodated sooner because a state prison regulation requires that such requests be acceded to "if possible," and because "there is no evidence that space in non-smoking housing was unavailable when [he] arrived [at NCCI]," he is free to make that case in an appropriate Ohio forum.  It does not, however, state a federal constitutional claim that he was treated with deliberate indifference as to a serious medical need. If his contention is that he had a medical determination of serious need for smoke-free housing by reason of his previous restriction at MCI that must trump any contrary, more recent finding at NCCI, then we return to the previous issue as to whether the Constitution requires non-medical prison official overrule the most recent medical finding in order to base their choice of action on a prior physician's judgment that is asserted to be more correct.  As noted, the law imposes no such requirement.

Finally, the assertion that Engle, in particular, had reasons to dislike Norris – thus making the denial of his request for non-smoking housing, though ostensibly based on Dr. Southall's opinion, merely pretextual – is equally an excursion into irrelevance.  Even if Norris is correct that Engle personally disliked him and would seize upon any opportunity to deny him any request, it does not prohibit Engle, a non-medical layperson, from here

-30-

relying, in the context of the Eighth Amendment, on the latest available professional medical opinion as to whether Norris had a "serious medical need" for non-smoking housing.  Absent such a medical finding, which was not made even after a contemporaneous medical examination, Norris is left, as before, with, at best, an internal prison grievance against Engle about handling a request for housing preference, not a constitutional claim.

## IV.  Conclusion

Accordingly, the defendants' motion for summary judgment is granted.

IT IS SO ORDERED.


Dated:  March 21, 2007                                      s/ William H. Baughman, Jr.
                                                                     United States Magistrate Judge